UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MATTHEW SHAW, Derivatively and on Behalf of FIREFLY AEROSPACE INC., <br><br> Plaintiff, <br><br> v. <br><br> JASON KIM, DARREN MA, REMINGTON WU, JORDI PAREDES GARCIA, KIRK KONERT, THOMAS MARKUSIC, MARC WEISER, THOMAS ZURBUCHEN, CHRISTOPHER EMERSON, RYAN BOLAND, PAMELA BRADEN, JON LUSCZAKOSKI, and KEVIN MCALLISTER <br><br> Defendants, <br><br> and <br><br> FIREFLY AEROSPACE INC., <br><br> Nominal Defendant. | Case No. 1:26-cv-02187 <br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Matthew Shaw ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Firefly Aerospace, Inc. ("Firefly" or the "Company"), files this Shareholder Derivative Complaint against  Jason Kim, Darren Ma, Remington Wu, Jordi Paredes Garcia, Kirk Konert, Thomas Markusic, Marc Weiser, Thomas Zurbuchen, Christopher Emerson, Ryan Boland, Pamela Braden, Jon Lusczakoski, and Kevin McAllister (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Firefly.

Plaintiff alleges the following against the Individual Defendants based upon personal

1

knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published and regarding Firefly, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Western District of Texas captioned *In re Firefly Aerospace Inc. Securities Litigation,* 1:25-cv-1812 (W.D. Tex.) (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**<u>NATURE OF THE ACTION</u>**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Firefly against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from August 7, 2025 to September 29, 2025 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Firefly and its shareholders, including monetary losses and damages to Firefly's reputation and goodwill.

2.      Firefly is a Texas-based space and defense technology corporation whose stated objective is to enable "responsive, regular, and reliable launch, transit, and operations in space for our customers across the globe." Firefly provides services to clients across the national security, government, and commercial sectors. The company operates through two primary business segments: Launch Solutions, which comprises the Alpha and Eclipse rocket programs, and Spacecraft Solutions, which encompasses the Company's Blue Ghost lunar lander and Elytra spacecraft products.

3.      Alpha serves as Firefly's flagship launch vehicle, which the Company publicly characterizes as "the only provider of small size launch that has achieved orbit and addresses a critical gap in the market in the 1,000 kilograms category." In reality, the Alpha rocket has experienced substantial developmental and operational difficulties. Firefly attempted six Alpha launches, four of which resulted in failure.

4.      Due to these repeated failures, on April 29, 2025, the Federal Aviation Administration ("FAA") issued a directive requiring Firefly to conduct a root-cause investigation into the Alpha rocket's malfunction history. The FAA additionally mandated that Firefly submit a detailed report outlining its investigative findings and identifying all corrective actions necessary to mitigate the risk of future launch failures. Until the FAA received and reviewed Firefly's report, the agency imposed a suspension on all further Alpha rocket launches.

5.      On August 7, 2025, Firefly conducted its Initial Public Offering ("IPO"), through which it sold approximately 19.296 million shares of common stock at an offering price of $45.00 per share.

6.      Throughout the Relevant Period, the Individual Defendants knowingly or recklessly made, or caused the Company to make, materially false and misleading statements and omissions regarding the commercial viability of the Alpha rocket program and the expected demand for the Company's Spacecraft Solutions segment. These statements created the false impression that Firefly possessed viable, market-ready launch capabilities and robust commercial traction across its product lines.

7.      For example, on August 8, 2025, Firefly filed a prospectus on Form 424B4 with the Securities and Exchange Commission ("SEC") in connection with the IPO (the "Form 424B4"). In that offering document, Defendants affirmatively represented the Alpha launch

vehicle as commercially competitive and operationally mature, asserting, in relevant part: "***Our Alpha launch vehicle is the only orbit-ready U.S. rocket in the 1,000 kilograms payload vehicle class.***"[1] This statement materially misrepresented the true operational status and reliability of the Alpha rocket and omitted adverse information concerning the developmental failures that had plagued the program.

8. Additionally, on August 26, 2025, the Company filed a Current Report on Form 8-K, representing that the FAA had granted Firefly clearance to conduct additional launch attempts of the Alpha rocket (the "FAA Clearance Form 8-K"). In that filing, the Company highlighted what it characterized as successful remedial and corrective measures implemented in response to prior Alpha launch failures, stating, in relevant part:

> The company conducted a thorough investigation with the FAA and in parallel assembled an Independent Review Board of multiple government agencies, customers, and industry experts. The findings confirmed Firefly's flight safety system performed nominally through all phases of flight. Both Alpha stages landed safely in the Pacific Ocean and the launch posed no risk to public safety.
>
> \* \* \*
>
> ***Fortunately, the corrective actions are straight forward***: increase thermal protection system thickness on Stage 1 and reduce angle of attack during key phases of the flight. Corrective actions have already been implemented.
>
> "At Firefly, technical challenges aren't roadblocks — they're catalysts," said Jordi Paredes Garcia, Alpha Chief Engineer at Firefly Aerospace. "Each mission provides us more data and enables us to continuously improve. ***Following all the lessons learned and corrective actions implemented, we were able to further increase Alpha's reliability***. We are grateful to the FAA, our customers, and the independent review board for their continued support through this process."
>
> ***With FAA approval to return to flight and corrective actions implemented***, Firefly is now working to determine the next available launch window for Alpha Flight 7.

9. The truth regarding the Company's deteriorating operational and financial

---

[1] Emphasis added unless stated otherwise.

condition began to emerge on September 22, 2025, when Firefly issued a press release disclosing materially adverse financial results for the second quarter of 2025 (the "2Q 2025 Earnings Press Release"). The Company reported a net loss of $80.3 million, a substantial increase from the $58.7 million loss reported for the second quarter of 2024. The 2Q 2025 Earnings Press Release further revealed that revenue from the Space Solutions segment had declined precipitously to $9.2 million, compared to $50.69 million in the prior quarter.

10.     These disclosures demonstrated that the Company's senior leadership and Board had failed to implement or maintain adequate oversight over Firefly's financial reporting processes, operational risk controls, and strategic execution. The revelations marked the first public indication that Defendants' prior assurances concerning Firefly's operational readiness, commercial demand, and revenue stability lacked any reasonable basis and that the Company had been suffering from significant undisclosed operational and financial problems. As a result, the Company—and therefore its shareholders—sustained substantial harm directly attributable to Defendants' breaches of fiduciary duties.

11.     On this news, the Company's stock price declined sharply, falling $7.58 per share, or approximately 15.3%, from a closing price of $49.52 on September 22, 2025, to close at $41.94 on September 23, 2025.

12.     The truth fully emerged on September 29, 2025, when the Company disclosed on its website that the seventh launch attempt of the Alpha rocket had also ended in failure (the "Alpha Launch Failure Website Disclosure"). In that disclosure, the Company admitted that the latest test resulted in yet another catastrophic malfunction, stating, in relevant part, that "[d]uring testing at Firefly's facility in Briggs, Texas, the first stage of Firefly's Alpha Flight 7 rocket experienced an event that resulted in a loss of the stage."

13.     On this news, the Company's stock price declined dramatically, falling $7.64 per share, or approximately 20.7%, from a closing price of $36.96 on September 29, 2025, to close at $29.32 on September 30, 2025.

14.     As a result of the foregoing, Firefly, as well as the Company's CEO and CFO, were named as defendants in the Securities Action by investors who allege they were damaged when they purchased Firefly shares during the Relevant Period.

15.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) the demand and growth potential for Firefly's Space Solutions segment had been materially overstated; and (2) the operational and commercial viability of the Alpha rocket program had likewise been materially overstated.

16.     As a result of the foregoing, Firefly, as well as several of its officers and directors, were named as defendants in a Securities Class Action by investors who allege they were damaged when they purchased Firefly shares during the Relevant Period.

17.     As set forth herein, and as alleged in the ongoing Securities Class Action, Firefly's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

18.     Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Class Action, a majority of Firefly's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 as Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and the Exchange Act.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

21.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

24.    Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

25.    Plaintiff is, and has been at all relevant times, a shareholder of Firefly.

*Nominal Defendant*

26.    Nominal Defendant Firefly is incorporated under the laws of Delaware, with its principal executive offices located at 1320 Arrow Point Drive #109, Cedar Park, Texas 78613. The Company's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "FLY."

*Individual Defendants*

27.    Defendant Jason Kim ("Kim") has served as Firefly's Chief Executive Officer and a member of the Board of Directors since October 2024. Kim is also named as a defendant in the Securities Class Action.

28.    The Company's 2026 Proxy Statement, filed with the Securities and Exchange Commission ("SEC") on April 17, 2026 (the "2026 Proxy"), states the following about Defendant Kim:

> **Jason Kim** has served as our Chief Executive Officer and as a member of the Board since October 2024. He previously served as Chief Executive Officer of Millennium Space Systems from December 2020 to September 2024 and as Vice President of Strategic Planning from September 2009 to December 2019. Mr. Kim has also held positions with Raytheon and Northrop Grumman. Mr. Kim attended the United States Air Force Academy, where he earned a BS in Electrical Engineering, and served in the United States Air Force from 1999 to 2006. Mr. Kim also earned a MS in Electrical Engineering from the U.S. Air Force Institute of Technology and an MBA from UCLA Anderson School of Management.
>
> We believe that Mr. Kim is qualified to serve as a director given his deep industry experience and his insight into our business as our Chief Executive Officer.

29.    Pursuant to the 2026 Proxy, Defendant Kim received $38,219,515 in total

8

compensation from Firefly in fiscal year 2025.

30. As of July 19, 2025, Defendant Kim owned 2,872,207 shares of Company stock.

31. Defendant Darren Ma ("Ma") has served as the Firefly's Chief Financial Officer since August 2020. Defendant Ma is also named as a defendant in the Securities Class Action.

32. The Company's Form 424B4 states the following about Defendant Ma:

> **Darren Ma** has served as our Chief Financial Officer since August 2020. Prior to that, Mr. Ma served as Chief Financial Officer and Senior Vice President of Spectra7 Microsystems from November 2017 to July 2020 and as Chief Financial Officer of GigPeak, Inc. from October 2014 to September 2017. Mr. Ma has also previously served as a business unit controller at Semtech (NASDAQ: SMTC) and a finance manager at Intel (NASDAQ: INTC). Mr. Ma received a BS in Managerial Economics from UC Davis and an MBA from the W.P. Carey School of Business at Arizona State University.

33. Pursuant to the 2026 Proxy, Defendant Ma received $11,326,441 in total compensation from Firefly in fiscal year 2025.

34. As of July 19, 2025, Defendant Ma owned 1,436,105 shares of Company stock.

35. Defendant Remington Wu ("Wu") has served as Firefly's Chief Accounting Officer since March 2025. Defendant Wu is also named as a defendant in the Securities Class Action.

36. Defendant Jordi Paredes Garcia ("Garcia") has served as Alpha Chief Engineer at Firefly since January 2021 and as the Company's Corporate Chief Engineer since February 2025. Defendant Garcia is also named as a defendant in the Securities Class Action.

37. Defendant Thomas Markusic ("Markusic") has served as the Company's Chief Technical Advisor since July 2022. He previously served as Chief Executive Officer from January 2014 through April 2023. Defendant Markusic is also named as a defendant in the Securities Class Action.

38. As of July 19, 2025, Defendant Markusic owned 12,487,089 shares of Company

9

stock, holding 5.2% of total voting power.

39.    Defendant Kirk Konert ("Konert") has served as a Company director since March 2022 and currently holds the positions of Chair of the Compensation Committee and member of the Audit Committee. Defendant Konert is also named as a defendant in the Securities Class Action.

40.    The Company's 2026 Proxy states the following about Defendant Konert:

> **Kirk Konert** has served as a member of the Board since March 18, 2022. Since December 2023, Mr. Konert has been a Managing Partner at AE Industrial Partners. Prior to that, Mr. Konert was a Partner at AE Industrial Partners from October 2019 to December 2021, and a Principal from August 2014 to October 2019. Mr. Konert currently serves on the board of directors of BigBear.ai (NYSE: BBAI), Calca Solutions, Redwire (NYSE: RDW), ThayerMahan, and York Space Systems (NYSE: YSS). Previously, Mr. Konert was a Senior Associate at Sun Capital Partners from July 2011 to July 2014 and was an analyst with Wells Fargo Securities' Industrial Group from June 2009 to June 2011. Mr. Konert earned a BA in Economics at Davidson College.
>
> We believe that Mr. Konert is qualified to serve as a director given his leadership and transactional experience.

41.    Defendant Ryan Boland ("Boland") has served as a Company director since the Company's IPO on August 7, 2025, and currently also serves as Chair of the Audit Committee.

42.    The Company's 2026 Proxy states the following about Defendant Boland:

> **Ryan Boland** has served as a member of the Board since completion of our IPO in August 2025. Since January 2024, Mr. Boland has served as Chief Executive Officer of ElementUSA Minerals and has served on its board of directors since April 2022. Mr. Boland has served on the board of directors of Lulu Snacks, Inc. since January 2025. Mr. Boland has served as the Chief Executive Officer of a private family office since December 2016. Prior to that, Mr. Boland worked at J.P Morgan from July 2005 to December 2016 in various executive roles across the Investment Bank and Private Bank departments, most recently as Executive Director of Global Investments, Private Bank. Mr. Boland earned a BS in Accounting from Villanova University.
>
> We believe Mr. Boland is qualified to serve as a director given his financial expertise and management credentials.

10

43.    As of July 19, 2025, Defendant Boland owned 2,870,151 sales of Company stock, holding 2.0% of total voting power.

44.    Defendant Pamela Braden ("Braden") has served as a Company director since the Company's IPO on August 7, 2025, and currently also serves as a member of the Audit Committee.

45.    The Company's 2026 Proxy states the following about Defendant Braden:

> **Pamela Braden** has served as a member of the Board since completion of our IPO in August 2025. Since February 2022, Ms. Braden has been an Operating Partner at AE Industrial Partners. Ms. Braden currently serves on the board of directors of BigBear.ai (NYSE: BBAI) and REDLattice and previously served on the board of directors of Belcan. Prior to joining AE Industrial Partners, Ms. Braden was the Chief Executive Officer and Founder of the digital engineering services firm Gryphon Technologies from January 1998 to December 2021. Prior to that, Ms. Braden served as an executive at various government sector-focused startups. Ms. Braden earned a BA in Political Science from the University of Akron.
>
> We believe Ms. Braden is qualified to serve as a director given her experience in the defense industry and as an executive for complex technology companies

46.    As of July 19, 2025, Defendant Braden owned 15,364 shares of Company stock.

47.    Defendant Christopher Emerson ("Emerson") has served as a Company director since September 2022, and he currently serves as a member of the Nominating and Corporate Governance Committee. Defendant Emerson is also named as a defendant in the Securities Class Action.

48.    The Company's 2026 Proxy states the following about Defendant Emerson:

> **Christopher Emerson** has served as a member of the Board since September 2022. Since January 2024, Mr. Emerson has been a Senior Partner at AE Industrial Partners and was an Operating Partner from October 2022 to January 2024. Mr. Emerson currently serves as Chairman of the board of ALL.SPACE, Chairman of the board of Spirent Federal Systems, and on the board of directors of Belcan and The Atlas Group. Previously, Mr. Emerson served on the board of directors at Hidden Level Inc. from May 2022 to October 2024 and

11

HawkEye 360 from September 2019 to November 2021. Mr. Emerson served as Chairman of the board of Airbus U.S. Space & Defense, Inc. (OTCMKTS: EADSY) from October 2021 to February 2022, Chairman of the Board and President of Airbus U.S. Space & Defense, Inc. from July 2019 to October 2021, and President of Airbus Helicopters, Inc. from June 2015 to July 2019. From 2003 to 2015, Mr. Emerson served in various roles at Airbus U.S. Space & Defense, Inc., including as Senior Vice President and Chief Financial Officer. Mr. Emerson earned a BAS in International Economics from the University of Alabama.

We believe that Mr. Emerson is qualified to serve as a director given his experience in the aerospace industry and extensive leadership experience.

49.    As of July 19, 2025, Defendant Emerson owned 15,364 shares of Company stock.

50.    Defendant Jon Lusczakoski ("Lusczakoski") served as a Company director since the Company's IPO on August 7, 2025, and he currently serves as a member of the Compensation Committee.

51.    The Company's 2026 Proxy states the following about Defendant Lusczakoski:

**Jon Lusczakoski** has served as a member of the Board since completion of our IPO in August 2025. Since February 2026, Mr. Lusczakoski has been a Partner at AE Industrial Partners and previously was a Principal from August 2024 to February 2026, a Vice President from August 2021 to August 2024, a Senior Associate from October 2020 to August 2021 and an Associate from August 2018 to October 2020. Mr. Lusczakoski currently serves on the board of directors of Calca Solutions and the National Security Space Association. Prior to joining AE Industrial Partners in August 2018, Mr. Lusczakoski was a Lead Engineer in the Program Development group at Williams International from June 2012 to July 2018. Mr. Lusczakoski earned a BS in Mechanical Engineering from Michigan State University and an MBA from the University of Michigan.

We believe Mr. Lusczakoski is qualified to serve as a director given his technical background.

52.    Defendant Kevin McAllister ("McAllister") served as a Company director since the Company's IPO on August 7, 2025, and currently serves as the Chair of the Nominating and

Corporate Governance Committee.

53.    The Company's 2026 Proxy states the following about Defendant McAllister:

**Kevin McAllister** has served as a member of the Board since completion of our IPO in August 2025. Since June 2020, Mr. McAllister has been a Senior Operating Partner and Co-Head of the Portfolio Strategy and Optimization Group at AE Industrial Partners. Mr. McAllister currently serves on the board of directors of Embraer S.A. (NYSE: ERJ). Mr. McAllister previously served as the Chairman of the board of directors of Belcan. Prior to joining AE Industrial in June 2020, Mr. McAllister served as President and Chief Executive Officer of Boeing Commercial Airplanes from December 2016 to October 2019. Prior to that, Mr. McAllister held positions at GE Aerospace (NYSE: GE) from 1989 to 2016, where he most recently served as President and Chief Executive Officer of GE Aviation Services from 2014 to 2016 and was previously Vice President and General Manager of Global Sales and Marketing from 2008 to 2014. He also held multiple leadership roles at GE Aerospace across Global Customer and Product Support, Overhaul & Component Repair Operations, Lean Six Sigma, and Engineering. Mr. McAllister earned a BS in Metallurgical and Materials Engineering from the University of Pittsburgh.

We believe Mr. McAllister is qualified to serve as a director given his leadership experience in the aerospace industry.

54.    Defendant Marc Weiser ("Weiser") served as a Company director from October 2024 until April 2026, during which time he served as a member of the Compensation Committee. Defendant Weiser is also named as a defendant in the Securities Class Action.

55.    The Company's Form 424B4 states the following about Defendant Weiser:

*Marc Weiser* has served as a member of our Board since October 2024. Mr. Weiser is the Founder and Managing Director of RPM Ventures, a venture capital firm, where he has been investing since May 2000. Mr. Weiser has served on the board of directors of numerous privately held companies during that time. Mr. Weiser earned a BA in Aerospace Engineering and an MBA from the University of Michigan. We believe that Mr. Weiser is qualified to serve as a director given his experience leading corporate strategy discussions at the board level and experience with developing and implementing strategies for growth and optimization, including partnerships, mergers and acquisitions, joint ventures, and divestitures.

13

56.     As of July 19, 2025, Defendant Weiser owned 4,045,252 shares of Company stock, holding 2.8% of voting power.

57.     Defendant Thomas Zurbuchen ("Zurbuchen") has served as a Company director since May 2025, and currently serves as a member of the Nominating and Corporate Committee. Defendant Zurbuchen is also named as a defendant in the Securities Class Action.

58.     The Company's 2026 Proxy states the following about Defendant Zurbuchen:

> **Thomas Zurbuchen** has served as a member of the Board since May 2025. Since June 2023, Dr. Zurbuchen has led the ETH Space initiative at ETH Zürich Space, a public university in Germany. Dr. Zurbuchen currently serves as a member of the board of advisors of Voyager Space, as a member of the board of McKinley Inc., and serves on the board of directors of the Schindler Group. Prior to that, Dr. Zurbuchen was Associate Administrator at the National Aeronautics and Space Association Science Mission Directorate from October 2016 to December 2022. Prior to that, from September 2014 to October 2016, Dr. Zurbuchen worked as a Talent Acquisition Specialist at eLab Ventures. From February 1998 to October 2016, Dr. Zurbuchen held various educational leadership positions at the University of Michigan, including as a Research Scientist from January 1998 to September 2003, as the Director of the Center for Entrepreneurship from October 2007 to August 2009, and as a professor from September 2003 to October 2016. Dr. Zurbuchen earned an MS and a PhD in physics from the University of Bern.
>
> We believe Dr. Zurbuchen is qualified to serve as a director given his technical background and extensive leadership experience in private and public institutions.

59.     As of July 19, 2025, Defendant Zurbuchen owned 6,146 shares of Company stock.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

60.     By reason of their positions as officers, directors, and/or fiduciaries of Firefly and because of their ability to control the business and corporate affairs of Firefly, the Individual Defendants owed Firefly and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

14

61.     The Individual Defendants were and are required to use their utmost ability to control and manage Firefly in a fair, just, honest, and equitable manner.

62.     The Individual Defendants were and are required to act in furtherance of the best interests of Firefly and its shareholders to benefit all shareholders equitably.

63.     Each director and officer of the Company owes Firefly and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

64.     As fiduciaries of Firefly, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

65.     The officers and directors of Firefly were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

66.     Each Individual Defendant under their position as officers of Firefly, owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

67.     As Firefly's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

68.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to

15

act in the best interest of the Company.

69.     As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

70.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a)     Ensure that the Company was operated in a diligent, hones, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to Firefly's Code of Business Conduct and Ethics and internal guidelines;

b)     Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

c)     Remain informed as to how Firefly conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection and in addition to that and to take steps to correct such conditions or practices;

d)     Establish and maintain systematic, accurate records and reports of the business and internal affairs of Firefly and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)     Maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Firefly's operations would comply with all laws and Firefly's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f)      Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate.

g)      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)      Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.     Each of the Individual Defendants also bore a duty of loyalty to Firefly and its shareholders, mandating the prioritizations of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

72.     During the pertinent times, the Individual Defendants served as agents for each other and for Firefly, always operating within the parameters of their agency.

73.     The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Firefly, were privy to detrimental, confidential information concerning the Company.

74.     Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this

complaint, as well as the content of the various public declarations made by Firefly.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.     In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

77.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

78.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Firefly, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

79.     Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

18

80.    At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Firefly, and at all times operated within the course and scope of that agency.

**FIREFLY AEROSPACE
CODE OF BUSINESS CONDUCT**

81.    In addition to the fiduciary duties numerated above, the Individual Defendants, like all employees, directors and officers of the Company, are required to comply with Firefly's Code of Business Conduct (the "Code of Conduct"). The Code of Conduct starts with a message from Firefly's CEO, Defendant Kim, which states the following, in relevant part:

> Our Code of Business Conduct, together with our Firefly Principles, is our team's playbook for how we operate as a company and as employees. Firefly leaders have additional requirements of leading by example and ensuring their teams understand and follow their integrity and compliance responsibilities. Please study our Code carefully and apply it in your daily decisions.
>
> At Firefly we respect and support each other, we speak up when necessary, and we always do the right thing – even when no one is watching. We ensure mission success for our customers by prioritizing quality and reliability in our products and safety in our workplace. We care about each other, our communities and are good stewards for the environment. We keep our promises to our customers, stakeholders and each other.
>
> At Firefly we value clear and kind communication and never tolerate retaliation. If a Firefly knows of unsafe practices, unethical behavior, or violations contrary to our Code, policies, or any applicable law, I trust they will speak up immediately. Our successes will continue as we act with integrity, take accountability for results, and do the right thing.
>
> *    *    *
>
> **We Do the Right Thing**
>
> ***Comply with the Code***
>
> Our Code is an important expression of our values and helps us make decisions that build and preserve trust and respect with our customers, suppliers, investors, governments, other third parties, and each other. It is a statement of our shared values that helps us operate openly, honestly, and ethically. Along with our Code, we adhere to all Firefly policies.

19

\* \* \*

Every Firefly employee, officer and board member is expected to read, understand, and comply with our Code. We expect our third parties, including suppliers, to act in a way that is consistent with the principles and values of our Code when doing business with Firefly. We expect employees working with our third parties to hold them accountable.

It is our responsibility to respond to inappropriate and unethical behavior. Failing to comply with our Code, Firefly's policies, or applicable law and regulations may lead to additional required training, disciplinary action, up to and including termination of employment or service.

We take alleged violations of our Code, our policies or applicable law seriously, and if someone raises a concern, it will be investigated fairly and promptly by the Legal and Compliance Department. If you are asked to help with the investigation of a matter, be candid and cooperative and avoid discussing the matter with others. Firefly has formed a Compliance Committee of executives and subject matter experts to ensure compliance concerns are addressed and resolved appropriately.

\* \* \*

### Ethical Decisions

We make decisions the right way. When the path forward is not clear, it can be helpful to ask ourselves:

1. Is it permitted by law?
2. Is it permitted by our Code, values and related policies?
3. Would we feel good if everyone knew about it?

If the answer to all questions is "yes," it is probably safe to proceed. But, if the answer to any question is "no" or "I'm not sure," stop and seek guidance.

\* \* \*

### Books & Records

We prepare and manage our business and financial records with integrity, accuracy, and transparency, while never compromising confidential information. We promptly and accurately enter all business and financial transactions in our books and records. We never misrepresent facts or falsify records. Accurate recordkeeping also means complying with our policies that relate to accounting procedures, financial controls, and records management.

We are committed to the full, fair, accurate, timely, and clear disclosure in reports and documents that we file with or submit to government agencies, including those in compliance with applicable securities laws. Misstating

20

financial results, incorrectly describing business transactions or destroying records in violation of our policies may be forms of fraud and can lead to serious civil and criminal penalties.

\* \* \*

**FIREFLY AEROSPACE**
**CORPORATE GOVERNANCE GUIDELINES**

82.     The Director Defendants have additional fiduciary duties as described in Firefly's

Corporate Governance Guidelines, which outline the role and responsibilities of the Board of

Directors. The Guidelines state, in relevant part:

> These Corporate Governance Guidelines have been adopted by the Board to assist the Board in carrying out its responsibilities. These Guidelines are intended to serve as a general framework within which the Board may conduct its business and affairs and not as a set of legally binding obligations and are to be interpreted in the context of all applicable laws and regulations and the Company's Certificate of Incorporation, Bylaws and other corporate governance documents. These Guidelines are subject to modification by the Board, and the Board shall be able, in the exercise of its discretion, to deviate from these Guidelines from time to time, as it may deem appropriate or as required by applicable law or regulation.

> The Board's principal responsibility is one of oversight. The Company's management is responsible for: (i) development and implementation of the Company's overall strategic and financial plans and operating goals; (ii) timely preparation of the Company's financial statements in accordance with generally accepted accounting principles and determining that they are complete, accurate; (iii) establishment of satisfactory disclosure controls and internal control over financial reporting; (iv) informing the Board about the Company's operations in a timely manner; and (v) identification and management of the Company's risks and development of risk mitigation strategies. The Company's independent auditor is responsible for auditing the Company's financial statements and, as applicable, the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for the Company's compliance with applicable laws and regulations and the Company's corporate governance documents.

> The Board is responsible for acting in a manner they reasonably believe to be in the best interests of the Company and its stockholders. The Board's responsibilities include: (i) reviewing and approving the overall financial and strategic plans and operating goals of the Company and monitoring the effectiveness of management and its achievement of such of plans and goals; and (ii) oversight of the Company's risk management process, which shall include periodic review of the principal risks

21

facing the Company and management's risk analysis including strategies to address and mitigate these risks. The Board executes its oversight responsibility directly and through its committees, which regularly report back to the full Board.

\* \* \*

**FIREFLY AEROSPACE**
**CHARTER OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS**

83. In addition to the fiduciary duties above, under the Audit Committee Charter in effect during relevant times, Defendants Boland (Chair), Braden, and Konert("Audit Committee Defendants") owed specific additional duties to Firefly. Specifically, the Audit Committee Charter States:

**PURPOSE**

The purpose of the Committee is to oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements and to assist the Board to fulfill the Board's oversight responsibilities with respect to the quality and integrity of the Company's financial statements, the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, as well as the qualifications, independence and performance of the Independent Auditors.

In fulfilling this purpose, the Committee is responsible for maintaining free and open communication between the Committee, the Internal Auditors, the Independent Auditors, and Company management and for determining that all parties are aware of their responsibilities.

\* \* \*

C. **Responsibilities**
Subject to the Company's Bylaws, the Committee will have the full power and authority to carry out the following activities:

\* \* \*

*Annual Financials and Audit; Quarterly Release of Financial Information*

7. Review and discuss with the Independent Auditors: the Independent Auditors' responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process; the overall audit strategy, planning and staffing; the scope and timing of the annual audit; any significant risks identified during the Independent Auditors' risk assessment procedures; and, when completed, the results of the annual

22

audit, including significant findings as well as critical accounting policies and practices used by the Company.

8.  Review and discuss with management and the Independent Auditors: any audit problems or difficulties, including difficulties encountered by the Independent Auditors or the Internal Auditors during their audit work (such as restrictions on the scope of their activities or their access of information or any accounting adjustments that were noted or proposed by the Independent Auditors but were "passed" (whether immaterial or otherwise)); any significant disagreements with management; and management's response to these problems, difficulties or disagreements.

9.  Engage in a dialogue with the Independent Auditors to understand the nature of each identified critical audit matter, the Independent Auditors' basis for identifying a matter as a critical audit matter and how each such identified matter will be described in the Independent Auditor's report.

10. Review and discuss with management and the Independent Auditors the Company's annual financial statements (including the related notes), the form of audit opinion proposed to be issued by the Independent Auditors on the financial statements and the disclosure "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K, before such report is filed with the SEC. The Committee shall recommend to the Board, based on the Audit Committee's review and discussion with management and the independent auditor, whether the audited financial statements should be included in the Company's annual report on Form 10-K.

11. Review, in consultation with management, the Internal Auditors and the Independent Auditors, the adequacy and effectiveness of the Company's internal control over financial reporting (ICFR) and disclosure controls and procedures (DCP), including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps performed in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such controls and, if applicable, management's and the Independent Auditor's report on the effectiveness of the Company's ICFR and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

12. .Review and discuss with management and the Independent Auditors the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's

23

quarterly report on Form 10-Q, before such report is filed with the SEC.

13.     Review and discuss with management and the Independent Auditors, as appropriate, earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information, as well as the substance of any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and the type of presentation to be made. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.

\* \* \*

## Compliance and Risk Management

20.     Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, including the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters as required by applicable law and as deemed appropriate.

\* \* \*

22.     Monitor compliance with the Company's Code of Business Conduct and oversee the investigation of any alleged breach or violation thereof by the Company's executive officers.

\* \* \*

### *Other Responsibilities*

25.     Review and discuss with management, and make recommendations to the Board, regarding the payment of any dividends to stockholders and any proposed repurchases by the Company of its common stock or other securities.

26.     Review and approve the Company's decision to enter into swaps or other derivative transactions that are exempt from exchange-execution and clearance under "end-user exception" regulations established by the Commodity Futures Trading Commission, and review and discuss with management the Company's policies governing the Company's use of such swaps and other derivative transactions.

27.     Review, approve, if deemed appropriate, and oversee any proposed transaction between the Company and any related person (as defined in Item

24

404 of Regulation S-K) in accordance with Company policies and procedures.

28.    Review, discuss and assess at least annually its own performance as well as the Committee's role and responsibilities as outlined in this Charter.

29.    Review and reassess annually the adequacy of this Charter and submit any suggested changes to the Charter to the Board for its consideration.

* * *

84.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act and the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## FACTUAL BACKGROUND

85.    Firefly is a Texas-based space and defense technology company whose stated mission is to provide "responsive, regular, and reliable launch, transit, and operations in space for our customers across the globe." Firefly conducts business with national security, government, and commercial clients. The company operates through two primary divisions: its Launch Solutions segment and its Spacecraft Solutions segment.

86.    The Launch Solutions segment consists of two launch vehicles: the Alpha rocket and the Eclipse rocket. The Alpha rocket is the first U.S.-based orbital rocket in the 1,000-kilogram

25

class to achieve a successful orbital mission. Firefly has deployed the Alpha rocket in responsive space missions, which the Company describes as a "significant differentiator for Firefly and a critical national defense solution." The Eclipse rocket, a reusable and scaled-up successor to the Alpha rocket, is projected to conduct its inaugural launch as early as 2026. The Eclipse rocket is designed to deliver payloads to Low Earth Orbit and to access Medium Earth Orbit, Geostationary Orbit, Highly Elliptical Orbit, and Trans-lunar Injection trajectories.

87.    The Spacecraft Solutions segment includes the Blue Ghost lander and the Elytra. The Company represents that the Blue Ghost lander is "the only commercial vehicle to ever achieve a fully successful Moon landing and the first U.S.-based lander to successfully complete a lunar surface mission since NASA's Apollo 17 in 1972." Firefly characterizes the Elytra as a "high thrust spacecraft platform creating new categories for space domain awareness and warfighting, long-range communications relays, on-orbit edge processing, and advanced space exploration." The Company further states that the Elytra is expected to support near-term Blue Ghost lander missions.

88.    The Alpha rocket has experienced a troubled development history, including four unsuccessful launch attempts. On April 26, 2025, the Alpha rocket suffered an additional launch failure, prompting the FAA to direct the Company to investigate the root cause of the incident, identify corrective measures to prevent future failures, and submit a report detailing its conclusions. As a consequence, the FAA barred the Company from conducting any further Alpha rocket launches until the required report was submitted and approved by the agency.

89.    Nevertheless, throughout the relevant period, Firefly consistently sought to reassure investors that the Alpha rocket was both "flight proven" and "commercially available."

90.    On July 11, 2025, the Company filed a registration statement on Form S-1 with the

SEC (the "Form S-1"), which constituted part of its registration statement and, following several amendments, was declared effective by the SEC on August 6, 2025.

91.    Firefly commenced its IPO on August 7, 2025, issuing approximately 19.296 million shares of common stock at a price of $45.00 per share.

92.    On the same day, during premarket trading hours, Defendant Kim appeared on CNBC to discuss the IPO. During that appearance, Defendant Kim asserted that the Company's "revenue-generating" products were "all mature," and he highlighted the Company's Spacecraft Solutions segment, stating, in relevant part:

> We've really set up ourselves for going public since our inception. *We've got four revenue-generating products that are all mature, and we've got flight heritage on our Alpha rocket just on our second launch. And we've landed on the moon. We're the first company to commercially land on the moon successfully – upright, stable.* And everybody talks about the landing but it's more about the mission, the fourteen day surface operations and provided all that data to NASA and all ten NASA science experiments got all the missions objectives completed.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### *Registration Statement*

93.    On August 8, 2025, the Company filed its Form 424B4 with the SEC, which, together with the Form S 1, constituted the "Registration Statement."

94.    The Registration Statement presented investors with an overview of the Company, describing Firefly as "one of the only U.S.-based commercial companies currently equipped to provide reliable access to launch, transit, and operations in space." The Offering Documents further asserted that the Company was "poised to grow in this attractive market."

95.    The Registration Statement additionally underscored the Alpha rocket's commercial readiness, stating, in relevant part: "Our Alpha launch vehicle is the only orbit-ready U.S. rocket in the 1,000 kilograms payload vehicle class." It also highlighted the strength of the

27

Company's "reliability-first approach" and its plans for the Alpha rocket's launch, stating, in relevant part:

> *We have taken a reliability-first approach to building our launch vehicles,* landers, and spacecraft. *We successfully built the world's largest all-composite launch vehicle, our Alpha rocket*. Our rockets are built using lightweight and strong carbon fiber, leveraging automated fiber placement technology to ensure unified production methodology across all of our product lines.

96.    Firefly also promoted the operational viability of the Alpha rocket, asserting that it was "on track" to provide a range of services to customers. Specifically, the Registration Statement stated, in relevant part:

> Our growth opportunity is dependent on our continued ability to expand our addressable launch market, win lunar and orbital missions and expand our portfolio of services related to those offerings. *For instance, building on our launch, lander, transit, and operations success with Alpha and Blue Ghost, we are on track for our spacecraft offerings to facilitate payload hosting services, transport services, utility services, and data services* in [Low Earth Orbit], [Medium Earth Orbit], and [Geostationary Orbit].

97.    The Registration Statement also promoted the strength of the Company's Spacecraft Solutions segment, asserting that the segment's performance "proves our capability to execute on challenging milestones" and that Firefly possessed a "competitive advantage" in the spacecraft business sector. Specifically, the Registration Statement stated:

> We are one of the few providers of lunar lander services with multiple planned launches under contracts and a multi-capability offering. *Our successful Blue Ghost mission this year proves our capability to execute on challenging milestones*: enter lunar orbit, measure radiation levels and the magnetic field in transit, land on the Moon, study the surface, and collect the most amount of data ever on the environment. *We expect our significant competitive advantage will grow as we continue to execute on our upcoming Blue Ghost missions*, with contracts already underway as part of NASA's $2.6 billion CLPS program.

### *Alpha Rocket Description on the Company Website*

98.    Throughout the Relevant Period, the Company's website emphasized the reliability of the Alpha rocket and described it as "[r]eady for launch." Specifically, under the heading

"Ready for Launch," the Company's website states:

> Firefly's Alpha rocket is equipped to launch more than 1,000 kg to low Earth orbit for commercial, civil, and national security missions. The flight-proven vehicle is designed to support regular, rapid, and reliable launches with direct, ondemand deliveries when and where customers need to fly. Alpha can be launched domestically or internationally through Firefly's launch facilities at the Vandenberg Space Force Base in California and new launch capabilities coming soon at the Mid-Atlantic Regional Spaceport (MARS) on Wallops Island, Virginia as early as 2026 and at the Esrange Space Center in Sweden as early as 2027.[2]

99. The FAA Clearance Form 8-K highlighted the corrective actions undertaken by the Company, stating in relevant part:

> The company conducted a thorough investigation with the FAA and in parallel assembled an Independent Review Board of multiple government agencies, customers, and industry experts. The findings confirmed Firefly's flight safety system performed nominally through all phases of flight. Both Alpha stages landed safely in the Pacific Ocean and the launch posed no risk to public safety.
>
> *   *   *
>
> Fortunately, *the corrective actions are straight forward*: increase thermal protection system thickness on Stage 1 and reduce angle of attack during key phases of the flight. *Corrective actions have already been implemented.*
>
> "At Firefly, technical challenges aren't roadblocks — they're catalysts," said Jordi Paredes Garcia, Alpha Chief Engineer at Firefly Aerospace. "Each mission provides us more data and enables us to continuously improve. *Following all the lessons learned and corrective actions implemented, we were able to further increase Alpha's reliability*. We are grateful to the FAA, our customers, and the independent review board for their continued support through this process."
>
> *With* FAA approval to return to flight and *corrective actions implemented*, Firefly is now working to determine the next available launch window for Alpha Flight 7.

100. The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, inter alia, that:

---

[2] Available at https://fireflyspace.com/alpha/ (accessed on December 10, 2025)

(i) the demand and projected growth of Firefly's Space Solutions segment were significantly overstated; (ii) and the operational and commercial viability of the Alpha rocket was overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or were issued without a reasonable basis at all relevant times.

## THE TRUTH EMERGES

### *2Q 2025 Earnings Press Release*

101.    The Company issued its 2Q 2025 Earnings Press Release on September 22, 2025, reporting disappointing financial results. The Press Release disclosed a quarterly loss of $80.3 million, or $5.78 per share, compared to a loss of $58.7 million, or $4.60 per share, in the second quarter of 2024. It further revealed Space Solutions revenue of $9.2 million—down sharply from $50.69 million in the prior quarter and from $18.09 million in the second quarter of 2024. The Press Release also reported total revenue of $15.55 million, missing analyst expectations of $17.25 million and reflecting a 26.2% year-over-year decline.

102.    Following this news, the Company's stock price declined $7.58 per share, or 15.3%, falling from $49.52 per share on September 22, 2025 to $41.94 per share on September 23, 2025. Nevertheless, the Individual Defendants continued to obscure the truth regarding the demand for the Company's Space Solutions segment and the operational and commercial readiness of the Alpha rocket.

103.    The Company also filed its Quarterly Report on Form 10-Q for the second quarter of 2025 (the "2Q 2025 Form 10-Q") on that same day, which was signed by Defendants Kim and Ma. The 2Q 2025 Form 10-Q included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002, executed by Defendants Kim and Ma, attesting to the accuracy of the filing and affirming that the 2Q 2025 Form 10-Q "does not

contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

104.    The 2Q 2025 Form 10-Q continued to portray the Alpha rocket as commercially viable, stating in relevant part: "*We expect to continue to ramp up our launch cadence as we increase our production rate on Alpha rockets*, and complete development of Eclipse."

105.    Additionally, the Company held an earnings call on September 22, 2025 to discuss its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Call"). During the call, Defendant Kim continued to promote the operational readiness of the Alpha rocket, stating in relevant part that "*[a]ll of Alpha's proven technologies* are scaled up to our larger reusable Eclipse rocket, capable of carrying 16 tons to orbit."

106.    Later in the 2Q 2025 Earnings Call, Defendant Kim further promoted the Alpha rocket's commercial prospects, stating:

> First off, Alpha. *It is a commercially available rocket*, and we're increasing our production capacity to deliver more and more Alphas per year. *It can support launching surrogate targets for the Golden Dome missions. It could also support launching test missions of things like hypersonic missiles, as well as space-based interceptors. It also can serve as an operational rocket as well.*

107.    The following exchange occurred during the question-and-answer portion of the 2Q 2025 Earnings Call, between an analyst and Defendant Kim, concerning future test launches of the Alpha rocket after the Company had regained FAA clearance only weeks earlier:

> Q: With the FAA approving return to flight for Alpha, how are you thinking about the timing of flight seven and eight, and how does that feed into your targeted launches for 2026? What are the range of potential outcomes for next year, you know, thinking about production capacity versus the current backlog?
>
> Defendant Kim: Thank you . . . . We received our FAA return to flight determination at the end of August. *We expect to launch flight seven in the coming weeks. If you saw our slides in the Alpha slide, you could see that flight seven is*

31

*in a mature state right next to flight eight in a mature state.*

108.    The statements made above were materially false and/or misleading, as they omitted to disclose material adverse facts concerning the Company's business, operations, and future prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, inter alia, that: (i) the demand and projected growth of Firefly's Space Solutions segment were significantly overstated; (ii) and the operational and commercial viability of the Alpha rocket was overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or were issued without a reasonable basis at all relevant times.

*September 29, 2025*
*Alpha Launch Failure Website Disclosure*

109.    The full truth emerged on September 29, 2025, when the Company published the Alpha Launch Failure Website Disclosure. The disclosure stated that "[d]uring testing at Firefly's facility in Briggs, Texas, the first stage of Firefly's Alpha Flight 7 rocket experienced an event that resulted in a loss of the stage."

110.    Following this news, the Company's stock price declined $7.64 per share, or 20.7%, falling from $36.96 per share on September 29, 2025 to $29.32 per share on September 30, 2025.

## DAMAGES TO FIREFLY

111.    As a direct and proximate result of the Individual Defendants' misconduct, Firefly has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

112.    Such expenditures include, but are not limited to, legal fees associated with defending against the federal securities lawsuit as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

32

113.    These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

114.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

115.    As a direct and proximate result of the Individual Defendants' actions, Firefly has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

116.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

117.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

118.    Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

119.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

120.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

121.    At the time this action was initiated, the eight-member Board consisted of Defendants Konert, Emerson, Zurbuchen, Braden, McAllister, Lusczakoski, Boland, and Kim (collectively, the "Director Defendants"). Plaintiff is required to demonstrate only that a majority, *i.e.* four of the Director Defendants, are incapable of exercising independent and disinterested judgment regarding whether to pursue this action or to vigorously advance its prosecution.

122.    In the Company's 2026 Proxy, it admits that as a "Controlled Company," it does not "have a majority of independent directors on the Board, and neither our Nominating and Corporate Governance Committee nor the Compensation Committee consists entirely of independent directors." 2026 Proxy at 12. The 2026 Proxy specifies that Defendants Kim, Konert, Emerson, Lusczakoski, and McAllister are not considered independent. *See id*.

123.    The Director Defendants either were aware or, in the exercise of reasonable diligence, should have been aware of the false and misleading statements disseminated on the Company's behalf and failed to undertake any good faith efforts to prevent or rectify the resulting misconduct.

124.    Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's

stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

125.    Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

126.    Furthermore, the Director Defendants knowingly disregarded, or acted with reckless indifference toward, the evident deficiencies in the Company's internal controls, practices, and procedures, and failed to undertake any good faith effort to remediate those deficiencies or to prevent their recurrence.

### *Defendant Kim*

127.    Defendant Kim is not disinterested or independent, and therefore, is incapable of considering demand because Kim, as the Company's CEO and as a director since October 2024, is an employee who derives substantial compensation in his role with the Company.

128.     The financial benefits received by Defendant Kim render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

129.    Notably, the Company's 2026 Proxy recognizes that Defendant Kim is not an independent director.

130.    As the Company's highest-ranking officer, Defendant Kim exercised little, if any, oversight over the Company's participation in the scheme to issue false and misleading statements, consciously disregarded his duties to monitor internal controls and reporting practices, and failed

35

to safeguard corporate assets. Throughout the Relevant Period, he also failed to correct the false and misleading statements alleged herein and personally made many of them.

131.    Defendant Kim further signed the false and misleading Registration Statement and the 2Q 2025 Form 10-Q.

132.    Defendant Kim is also a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

133.    For these reasons, Defendant Kim cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood. Demand upon his is futile and, therefore, excused.

### *Defendant Emerson*

134.    Defendant Emerson has served as a Company director since September 2022 and is a member of the Nominating and Corporate Governance Committee.

135.    Notably, the Company's 2026 Proxy recognizes that Defendant Emerson is not an independent director.

136.    Defendant Emerson is also a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

137.    Accordingly, Defendant Emerson breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Demand upon him is therefore futile and excused.

### *Defendant Konert*

138.    Defendant Konert has served as a Company director since March 2022 and currently serves as Chair of the Compensation Committee and as a member of the Audit Committee.

139.   Notably, the Company's 2026 Proxy recognizes that Defendant Konert is not an independent director.

140.   Defendant Konert is also a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

141.   Accordingly, Defendant Konert breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Demand upon him is therefore futile and excused.

### *Defendant Lusczakoski*

142.   Defendant Lusczakoski has served as a Company director since the Company's IPO on August 7, 2025, and is a member of the Compensation Committee.

143.   Notably, the Company's 2026 Proxy recognizes that Defendant Lusczakoski is not an independent director.

144.   Accordingly, Defendant Lusczakoski breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Demand upon him is therefore futile and excused.

### *Defendants Boland, Braden, and Konert*

145.   Additionally, Defendants Boland (as Chair), Braden, and Konert (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law,

including breaches of fiduciary duty and violations of the Securities Act and the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

### *All Directors*

146.    The Directors, as members of the Board, were and are subject to the Code of Business Conduct and Ethics, which go well beyond the basic duties required by applicable laws, rules, and regulations.  Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Director Defendants breached the Company's Code of Business Conduct and Code of Ethics, face substantial liability, and are not independent or disinterested, making demand upon them futile.

147.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting,

overseeing disclosure controls and procedures and calling into question the Individual Defendants'

conduct.  Thus, any demand upon the Directors would be futile.

148.    All current members of the Board receive substantial revenue from the Company,

exert control over its operations, and maintain interdependent relationships with one another.

These conflicts of interest have impaired the Board's ability to objectively evaluate or challenge

the conduct of the Director Defendants.

149.    None of the current members of the Board have undertaken any corrective measures

to address the misconduct alleged herein. For example, none of the current directors have

attempted to enforce the Company's Clawback Policy, which states:

> In the event the Company is required to prepare an accounting restatement due to
> the material noncompliance of the Company with any financial reporting
> requirement under the securities laws (including any required accounting
> restatement to correct an error in previously issued financial statements that is
> material to the previously issued financial statements, or that would result in a
> material misstatement if the error were corrected in the current period or left
> uncorrected in the current period), the Company will recover reasonably promptly
> the amount of incentive-based compensation (defined as compensation that is
> granted, earned or vested based wholly, or in part, upon the attainment of a financial
> reporting measure received by any Covered Executive during the relevant recovery
> period (described in Section 3 below) that exceeds the amount of incentive-based
> compensation that otherwise would have been received had it been determined
> based on restated amounts computed without regard to any taxes paid ("erroneously
> awarded compensation"), as calculated pursuant to Section 1 below.
>
> Incentive-based compensation shall be deemed received in the Company fiscal
> period during which the financial reporting measure specified in the incentive-
> based compensation award is attained, even if the payment or grant of the incentive-
> based compensation occurs after the end of that period.

150.    The Individual Defendants' conduct described herein and summarized above could

not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation

from their violations of duty pursuant to the Company's charter (to the extent such a provision

exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151. Firefly has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Firefly any part of the damages Firefly suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

152. The acts complained of herein constitute violations of fiduciary duties owed by Firefly's officers and directors, and these acts are incapable of ratification.

153. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Firefly. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Firefly, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

40

154.     If there is no directors' and officers' liability insurance, then the Directors will not cause Firefly to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

155.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

**CLAIMS FOR RELIEF**

**COUNT I**

**Breach of Fiduciary Duty**
**Against the Individual Defendants**

156.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Firefly's business and affairs.

158.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.     The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.

160.     The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Firefly's shareholders.

161.     In breach of their fiduciary duties owed to Firefly, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose, inter alia, that: (i) the demand and projected growth of Firefly's Space Solutions segment were significantly overstated; (ii) and the operational and commercial viability of the

41

Alpha rocket was overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or were issued without a reasonable basis at all relevant times.

162. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

163. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations.

164. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Firefly's securities.

165. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Firefly has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

167. Plaintiff, on behalf of Firefly, has no adequate remedy at law.

**COUNT II**

**Unjust Enrichment Against
The Individual Defendants**

168.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Firefly.

170.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Firefly that was tied to the performance or artificially inflated valuation of Firefly or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

171.    All the payments and benefits provided to defendants were at the expense of Firefly. The Company received no benefit from these payments.

172.    Plaintiff, as a shareholder and a representative of Firefly, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173.    Plaintiff, on behalf of Firefly, has no adequate remedy at law.

### COUNT III

**Waste of Corporate Assets**
**Against the Individual Defendants**

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Firefly to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

176.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

177.    Plaintiff, on behalf of Firefly, has no adequate remedy at law.

### <u>COUNT IV</u>

**Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act Against Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, Zurbuchen, and Emerson**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    As a consequence of the conduct and events described above, Firefly has been named as a defendant in the Securities Action filed on behalf of the Company's shareholders. In that action, Firefly is alleged jointly liable for violations of Sections 11 and 15 of the Securities Act, as well as Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

180.    Federal law affords Firefly a right to seek contribution from other alleged joint tortfeasors pursuant to Section 11(f) of the Securities Act.

181.    The Securities Action alleges that the Registration Statement issued in connection with Firefly's initial public offering contained materially false and misleading statements and omitted material information necessary to ensure that the statements made were not misleading, including material facts required to be disclosed.

182.    Firefly served as the registrant for the IPO, while Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, Zurbuchen, and Emerson were responsible for preparing, approving, and disseminating the Registration Statement.

183.    As the issuer of the securities offered in the IPO, Firefly faces strict liability to the putative class with respect to the alleged material misstatements and omissions contained in the Registration Statement.

184.    The Securities Action further alleges that none of the named defendants conducted a reasonable investigation or possessed reasonable grounds to believe that the Registration Statement was accurate, complete, and free of material omissions or misleading statements.

185.    By virtue of their positions as Firefly officers and/or directors, Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, Zurbuchen, and Emerson exercised, directly and indirectly, control over Firefly's business operations and corporate affairs, including the conduct challenged in this action and the Securities Action. Accordingly, those defendants are subject to potential liability for contribution under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which provides a private right of action for contribution, as well as Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), governing contribution claims arising from violations of the Exchange Act.

186.    Accordingly, Firefly is entitled to pursue contribution and/or indemnification from Defendants Kim, Ma, Wu, Garcia, Konert, Markusic, Weiser, Zurbuchen, and Emerson.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

45

a)      Declaring that the Plaintiff may maintain this action on behalf of Firefly and that Plaintiff is an adequate representative of the Company;

b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Firefly;

c)      Determining and awarding to Firefly the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve Firefly's corporate governance and internal procedures to comply with applicable laws and to protect Firefly and its shareholders from a repeat of the damaging events described herein;

e)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 7, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/Saadia Hashmi*
Saadia Hashmi (State Bar No.: 24139546)
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

**KUEHN LAW, PLLC**
Justin A. Kuehn

53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*

\

47

**VERIFICATION**

I, Matthew Shaw, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Firefly Aerospace, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _Sixth_ day of _August_ 2026.

Matthew Shaw (Aug 6, 2026 13:56:18 EDT)

Matthew Shaw